IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Adam Evans, ) | Civil Action No. 6:15-887-BHH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Wilson Trucking Company, ) | |
| Keith Doonan, and Tim Stokes, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on the defendants' motion for summary judgment (doc. 39).  The plaintiff, who is proceeding *pro se*, alleges that the defendants discriminated against him because of his race and retaliated against him because of a complaint he made to a safety supervisor, in violation of Title VII of the Civil Rights Act of 1964, as amended, and Title 42, United States Code, Section 1981.[1]

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

On November 5, 2015, the defendants filed a motion for summary judgment (doc. 45).  On November 6, 2015, this court issued an order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) advising the plaintiff of the summary judgment procedure and directing him to file a response by December 10, 2015.  The plaintiff did not file a response.  As the plaintiff is proceeding *pro se*, on December 16, 2015, the court issued an order giving the plaintiff through January 5, 2016, to file his response and notifying him that if he failed to respond his case would be subject to dismissal for failure

---

[1]The plaintiff stated in his deposition that his only claims were brought under Title VII and Section 1981 (doc. 39-2, pl. dep. 17).

to prosecute.  The plaintiff filed his response on January 5, 2016 (doc. 53).  On January 13, 2016, the defendants filed a reply (doc. 55).

## FACTS PRESENTED

The defendant Wilson Trucking ("Wilson") is in the freight transportation business (doc. 39-5, Lackey aff. ¶ 3).  It operates from various terminals located throughout the Southeast United States.  One such terminal is located in Lexington, South Carolina (*id*.).  The Manager of the Lexington terminal during the time relevant to this case was defendant Keith Doonan.  The Dispatch Supervisor for the terminal was defendant Tim Starkes, who is incorrectly named in the complaint as Tim Stokes.  He was the direct supervisor and contact person for all pickup and delivery ("P&D") drivers, including the plaintiff. Dale Cannon was the Inbound Dock Supervisor.  Jimmy Compton was the District Operations Manager whose district encompasses the Lexington terminal.  Fred Lackey was the Corporate Director of Human Resources with offices located in Fishersville, Virginia, and Tim Taylor was the Regional Safety Manager with his office located in the Atlanta terminal.  Wesley Monteith was the Lead Driver Instructor for the driver workforce, and his home terminal is in Charlotte, North Carolina (*id.* ¶ 4; doc. 39-2, pl. dep. 17, 50, 51-53).

Tim Starkes, Dale Cannon, Tim Taylor, and Wesley Monteith are African-Americans (doc. 39-2, pl. dep. 53).  The plaintiff is a 54 year old African-American male (*id.* 11).  He originally applied for a position with Wilson at the Lexington terminal on March 19, 2012 (*id.* 41).  He was hired on April 9, 2012, as a dock worker/tractor trailer driver (*id.* 41-42).  The plaintiff was interviewed by Tim Starkes during the hiring process, which led to him being hired (*id.* 42).  Jimmy Compton, the District Operations Manager, approved his hiring (*id.*).  The plaintiff was transferred from a dock worker/tractor trailer driver to a full-time P&D on January 20, 2013, along with a raise (*id.* 43; doc. 39-7, change in pay status).  Keith Doonan and Jimmy Compton were responsible for the plaintiff's promotion to the P&D driver job along with his pay increase (doc. 39-2, pl. dep. 45).  Doonan approved and presented the plaintiff with six pay raises during his employment bringing him from starting pay of $17.00 an hour to top pay for P&D drivers under Wilson's

2

scale, at $19.75 per hour (*id.* 41-43; doc. 39-7, change in pay status). The plaintiff remained in the P&D driver position until his employment with Wilson ended on August 15, 2013 (doc. 39-2, pl. dep. 46-47; doc. 39-8, separation of employment).

The plaintiff testified in his deposition that none of the following individuals ever did anything unfair, wrongful, or unlawful to him, nor did they display any dislike, ill will, or hatred to him: Jimmy Compton, Fred Lackey, Tim Taylor, Melissa Heskett, Keith McLeod, Dale Cannon, and Rodney Oxendine (doc. 39-2, pl. dep. 103-106). Jimmy Compton and Fred Lackey were the managers responsible for the approval of the plaintiff's termination on August 15, 2013 (doc. 39-5, Lackey aff. ¶ 6). In his time with Wilson, the plaintiff never heard any manager or co-worker use any racially derogatory term or racial slur (doc. 39-2, pl. dep. 240-41).

Wilson publishes to all of its employees a policies handbook (*id.* 110). The plaintiff received a copy of the handbook that he acknowledged on March 26, 2012 (*id.*; doc. 39-9, receipt). Under Wilson's practices and rules of conduct, the following are automatic termination offenses: unacceptable behavior and causing disruption in the workplace or disruption to production; insubordination and failure to follow instructions; refusing or abandoning a run and causing a service failure; disrespect to management and co-workers; conduct that can be damaging to or harm the reputation of the company; and conducting oneself in a negligent or careless manner (doc. 39-2, pl. dep.110-12).

The handbook also contains Wilson's anti-discrimination, anti-harassment policy (*id.* 112; doc. 39-10, policies). That policy prohibits discrimination, harassment, and retaliation in the workplace, including discrimination based upon race. Violators of this policy are subject to termination (doc. 39-10, policies). All complaints of discrimination are investigated. There are many avenues of complaint should an employee believe that he or she has been subjected to discrimination (*id.*). The employee can complain to his or her direct supervisor, the terminal manager, the regional manager, any member of management, the human resources department, or by calling the home office human resource line (*id.*). The plaintiff received, read, and understood this policy at the beginning

3

of his employment (doc. 39-2, pl. dep. 110; doc. 39-9, receipt).  The plaintiff testified that at no time during or after his employment with Wilson did he ever invoke this policy or make any complaint of race discrimination (doc. 39-2, pl. dep. 112).

The plaintiff acknowledged his duties as a P&D driver for Wilson in his deposition.  The "worst thing for a truck driver is causing a service failure, [t]hat's a big no-no termination offense . . . ." (*id.* 121-22).  Above all, his primary duty for Wilson was to pick up and deliver freight (*id.* 256-57).  Additionally, the plaintiff acknowledges that he had a duty and was required to work his schedule and perform his duties until the work was done and he was released by his supervisor (*id.* 123-24).  He also was required to stay in communication with and call his dispatcher while out on the road and let the dispatcher know whether there was going to be any delay and what was going on (*id.* 146-48).  He would do this using his personal cell phone (*id.* 123).  The plaintiff further admits that his managers talked to him in 2012 and 2013 about not calling in (*id.* 146-47).  On one of his job evaluations, he wrote that he needed to improve about calling in and staying in contact with dispatch (*id.* 147).  The plaintiff's failure to call in had been a problem for his managers (doc. 39-6, Doonan decl. ¶ 5).  According to defendant Doonan, in the many years he worked in the trucking business, he had never had any driver who failed to call in as much as the plaintiff (*id.*).

On August 15, 2013, the plaintiff showed up for his daily shift at around 7:10 a.m. (doc. 39-2, pl. dep. 132-33).  He was dispatched out on his route at 7:30 a.m.  He had 16 shipments to deliver on his manifest, not counting pickups that would need to be done later in the afternoon after the deliveries were made (*id.*).  On this particular day, Doonan was covering the dispatch function for Starkes as Starkes was helping out in another terminal (doc. 39-6, Doonan decl. ¶ 6).  The morning hours passed, and  Doonan heard nothing from the plaintiff, although he had received calls from customers on the plaintiff's route regarding various issues that needed to be taken care of (*id.*).  Doonan attempted to contact the plaintiff in the late morning and around 11 :00 a.m. left him a message to call back (*id.*; doc. 39-2, pl. dep. 137).

The plaintiff called Doonan back around 11:30 a.m. on August 15th (*id.* 133-37, 141-42). Doonan asked the plaintiff why he had not followed proper procedure and called in as he had been earlier instructed (*id.* 139). The plaintiff conceded in his deposition that it was possible that he was loud with his terminal manager and a little disrespectful (*id.* 142-43). Doonan continued to question the plaintiff about why he had not properly called in (doc. 39-6, Doonan decl. ¶ 7). He also inquired about the plaintiff's progress on the route (doc. 39-2, pl. dep. 139). The plaintiff admits that at the end of his telephone call with Doonan, he told Doonan he was bringing the truck back to the terminal to get something unloaded and to make another delivery (*id.* 141). The plaintiff acknowledged that Doonan did not approve him to return to the terminal (*id.* 143). The last thing he said to Doonan before he hung up was, "I'm bringing the truck back in to unload the freight. Southern Anesthesia" (*id.* 143, 161). The plaintiff brought the truck back to the terminal without approval and without continuing his route and making at least seven assigned deliveries (*id.* 142).

The plaintiff indicated in his deposition that he called the terminal before 11:30 a.m. on August 15th. First, the plaintiff stated in his deposition that he later wrote down on his driver manifest sheet the times that he had called the terminal (*id.* 133-34; doc. 39-11, driver manifest sheet). The self-written notes indicate no calls to the terminal between 9:13 a.m. and 11:30 a.m. on August 15th (doc. 39-11, driver manifest sheet). Later in his deposition, the plaintiff conceded that it may have been up to two hours that he did not call in to his dispatcher (doc. 39-2, pl. dep. 141).

The plaintiff identified the number of the phone he was using while on his route the morning of August 15th as (803) 402-9457 (an AT&T number) (*id.* 29-30, 123). After the plaintiffs deposition, telephone phone records were subpoenaed for that number and that day (doc. 39-5, Lackey aff. ¶ 12; doc. 39-12, AT&T phone recs.). The Lexington terminal telephone phone number is (803) 951-3888 (doc. 39-5, Lackey aff. ¶ 12). The subpoenaed phone records establish the first time the plaintiff called the terminal number was 11 :03 a.m. on August 15th. The plaintiff dialed the terminal number from his cell phone

at 11:03 a.m., 11:51 a.m., and three times at 12:00 noon. However, the record shows that he had no conversation with dispatch during the first four times he called, because the connect times were 17 seconds, 14 seconds, eight seconds, and zero seconds, respectively. The only call identified on the independently subpoenaed records showing that the plaintiff spoke with anyone was the third call he made at noon that lasted two minutes and 43 seconds, which was presumably the call with Doonan. Otherwise, the plaintiff had no communications with dispatch the entire morning of August 15, 2013, according to these telephone records from AT&T (doc. 39-5, Lackey aff. ¶ 12; doc. 39-12, AT&T phone recs.). The plaintiff made telephone calls to other numbers at 10:51 a.m. and 11 :03 a.m., one of which lasted for 11 minutes (doc. 39-12, AT&T phone recs.).

After his call with Doonan, the plaintiff brought his truck back to the Lexington terminal (doc. 39-2, pl. dep. 142):

> Q: Okay. And you admit in your Complaint that no one approved, authorized or directed you to come back to the terminal on that day-Doonan or any supervisor; correct? I mean, that's just the simple truth.
>
> A: Not that I remember, no.

(*Id.*159). The plaintiff does not dispute that bringing his tractor trailer back in with the undelivered loads caused service failures on the other shipments (*id.* 146; doc. 39-6, Doonan decl. ¶ 7).

When the plaintiff returned to the terminal, he participated in a meeting with Doonan to which Darby Curtis was a witness (doc. 39-2, pl. dep. 143). Doonan told the plaintiff, "You haven't called all morning. I've had customers calling. I was instructing you to follow policy and you brought your unit back in. I didn't fire you" (*id.* 144-45). There was debate back and forth between Doonan and the plaintiff as to whether the plaintiff abandoning his run constituted his quitting or whether he was being terminated (*id.*). The plaintiff's employment ended at that time on Thursday, August 15, 2013 (*id.* 132). During all the conversations he had with Doonan on August 15th, at no time did the plaintiff ever

6

indicate that he was being mistreated or terminated because of his race or for retaliatory reasons (*id.* 144-45).

After the plaintiff's call with Doonan on August 15th, but before the plaintiff had returned to the terminal, Doonan contacted his District Operations Manager, Jimmy Compton, and the Director of Human Resources, Fred Lackey (doc. 39-5, Lackey aff. ¶ 5; doc. 39-6, Doonan decl. ¶ 8).  After discussing the plaintiff's continued failure to call in while on his route, his failure to call in that morning, the disrespectful language he used towards the terminal manager on the phone, and the fact that he did not finish his route but rather returned to the terminal with shipments undelivered, Compton and Lackey approved the termination of the plaintiff's employment (doc. 39-5, Lackey aff. ¶ 6).  The plaintiff does not dispute this (doc. 39-2, pl. dep. 109).  The plaintiff testified that he does not know what the motives were on the part of the decision-makers regarding his termination from employment (*id.*).  He has no knowledge, evidence, or belief that Compton or Lackey were racist in any way (*id.* 162).  He did not know Fred Lackey.  Prior to his termination, the plaintiff testified that he never made any complaints known to Lackey or Compton (*id.*).

Prior to his termination from employment in August 2013, the plaintiff had received a final written warning with a disciplinary suspension on March 11, 2013 (*id.* 243-44; doc. 39-13, correction notice).  According to the correction notice, the warning was for breaking company rules and improper conduct (doc. 39-13, correction notice).  In the notice, Wesley Monteith, the Driver Instructor who is African- American (doc. 39-2, pl. dep. 53), stated that during a routine audit the condition of the plaintiff's unit did not meet Wilson's standards and, when questioned, the plaintiff was argumentative and uncooperative (doc. 39-13, correction notice).  The plaintiff received another final warning for a preventable accident on June 13, 2013, which he admits was legitimate (doc. 39-2, pl. dep. 247-48; doc. 39-14, correction notice).  The plaintiff stated in his deposition that "to his knowledge," neither of these warnings were given based on his race (doc. 39-2, pl. dep. 247, 249).  Four days before his termination on August 15th, the plaintiff's managers raised

7

his pay rate to top pay on August 11, 2013 (doc. 39-2, pl. dep. 114; doc. 39-15, change in pay status).

> The plaintiff testified as follows in his deposition:
>
> Q: You don't know what they considered, what investigation they conducted, you don't know what their motives were other than you bringing the truck back and disrespectful to Doonan on 8/15/13. You don't know any of that, do you?
>
> A: None whatsoever.
>
> ***
>
> Q: But for that telephone call you had with Keith Doonan on August 15th, and the fact that you came back to the terminal and brought your load back, there was absolutely no other basis or reason for Wilson to terminate you; there was no other grounds. You hadn't done anything else, had you?
>
> A: None that I know of. No one told me there was a grounds for termination.
>
> Q: So there was nothing else but that, that you're aware of, correct?
>
> A: That's all I can think of.

(Doc. 39-2, pl. dep. 109, 163). The plaintiff acknowledged that if an employee of Wilson was insubordinate, disrespectful, abandoned a run or caused a service failure – those were automatic termination offenses (*id.* 163).

The plaintiff acknowledges that 80% of the drivers at the Wilson terminal in Lexington were African-American (*id.* 127). The plaintiff testified that he does not know of any other driver who was disrespectful with the terminal manager, came back off his run, caused a service failure, and was not terminated (*id.*. 145-46, 162-63). In his EEOC questionnaire, the plaintiff stated that the two persons who discriminated against him were Doonan and Starkes (*id.* 258).

In his complaint, the plaintiff also alleges that a Caucasian driver with less seniority and experience received a higher hourly rate than him, which he claims to be

discriminatory (doc. 1, comp. ¶¶ 14-15).  He bases this claim on the following:  Around February 9, 2013, the plaintiff saw Rodney Oxendine's pay stub in the break room (doc. 39-2, pl. dep. 215-16; doc. 53-5, Oxendine pay stub).  The pay stub did not have a pay rate on it but did display the total pay and the hours worked by Oxendine (*id.*).  The plaintiff divided the hours into the pay and concluded that Oxendine was making $18.90 an hour while he was making $18.57 an hour (*id.*).  He believed this to be unfair because Oxendine was a less senior, less experienced driver and drove a straight truck rather than a tractor trailer (*id.*).  Oxendine is the sole comparator for the plaintiff's discriminatory pay claim in this lawsuit (*id.* 213-15).

During the plaintiff's employment with Wilson, the company was having financial difficulties (doc. 39-5, Lackey aff. ¶ 9).  Accordingly, in late 2012, the company made a change to its benefits policy.  Prior to January 1, 2013, employees could cover their dependants on the company medical plan.  As of January 1, 2013, Wilson changed that benefit to where if a driver had a spouse working for another employer, and that employer provided insurance to the spouse, Wilson would not provide insurance for the spouse.  If a spouse was not covered by another employer's insurance, they could be covered by Wilson's medical plan as a dependent (*id.*; *see* doc. 53-10, 9/19/12 letter to employees).  As of January 1, 2013, Oxendine's wife was taken off Wilson's insurance because she had her own employer's insurance (doc. 39-5, Lackey aff. ¶ 10).  However, Wilson did not stop the deduction from Oxendine's paycheck for dependent coverage for his wife (*id.*).  Therefore, Oxendine was reimbursed with a lump sum payment in his check for the pay period ending February 9, 2013.  The lump sum payment was in the amount of $29.72 (*id.*).  If this reimbursement of the deducted spousal insurance premium is subtracted from Oxendine's February 9th pay, that drops his rate of pay to $18.13 an hour, while the plaintiff was making $18.57 per hour (*id.*).  The plaintiff does not have any evidence that Oxendine was being paid an hourly rate in excess of his own (doc. 39-2, pl. dep. 128-129, 223-224).  This one paycheck of February 9, 2013, is the only pay period he compared with Oxendine (*id.* 219-20).

9

After being made aware of the foregoing, the plaintiff testified:

Q: Now, if you had called Fishersville they would have told you what was going on, but it didn't get there. So, with all that said, as we sit here today, the absolute truth is that as of the beginning of 2013 Rodney Oxendine was not making more than you. Is that understood and agreed to now?

A: If that's the case, yes, it would be. Yes.

\*\*\*

Q: Okay. So we don't have a race discrimination claim on pay with Rodney Oxendine anymore; correct?

A: Well, I see your point, yes.

(*Id.* 219, 223). The defendants have presented payroll records showing that at no time during his employment did Rodney Oxendine's hourly wage rate exceed the plaintiff's rate (doc. 39-2, pl. dep. 222-23; docs. 39-16 and 39-17, rates of pay).

In his complaint, the plaintiff alleges that he had complained that he was "being treated different than White employees, to which he was ignored and ultimately terminated for complaining" (doc. 1,comp. ¶ 21). In his deposition, the plaintiff testified that the sole basis for his retaliation claim was that in May 2013 he called Tim Taylor, Wilson's Safety Director who was located in Atlanta, to complain that Oxendine was being paid more than him (doc. 39-2, pl. dep. 73-75, 214-17, 224-26, 235-37; doc. 1, comp. ¶ 22). In his response in opposition to the motion for summary judgment, the plaintiff claims that he called Taylor on April 19, 2013, and told Taylor that "he just wanted to be treated like everyone else" and asked whether it was "correct for a less senior driver to be getting paid more, if Plaintiff should be taken off a route and be given to a less senior driver," and why he was "being given heavy loads and they were not" (doc. 53 at 4-5).

The plaintiff also claims that on April 22, 2013, he spoke with defendants Doonan and Starkes about his pay (*id.* at 5-6).[2]  He claims that Doonan denied that

---

[2]The plaintiff submitted an exhibit that he claims is a partial "transcription of the recording of that meeting" (doc. 53-7, trans. of meeting).

Oxendine was being paid more than the plaintiff and that Doonan had a "tone of discriminatory retaliation" (*id.* at 6). He further claims that Starkes attacked his "religious moral"[3] (*id.* at 7). He claims that "just days" after he spoke with Doonan and Starkes, on April 25, 2013, he "received a load to deliver for a company named US Food, load that Plaintiff had to sort and segregate in a freezer for hours," which was "retaliatory" (*id.* at 7-8).

The plaintiff never made any complaint of discrimination or racism to Taylor, Doonan, or Starkes (doc. 39-2, pl. dep. 235-37). The plaintiff testified:

> "Q: And I've listened to every single word on that recorded conversation, as well as the ones that were recorded by Tim Taylor. You're very careful about what you say. You don't want to accuse without proof; right?
>
> A: Exactly.
>
> Q: And not in any of those conversations with Tim Taylor or Tim Starkes or Keith Doonan, you never say race, you never say racism, you never say discrimination, you never say retaliation, you never say white, you never say black, you never say the N word. You never bring that up in these conversation, ever.
>
> A: No.
>
> Q: Is that correct?
>
> A: That's correct.
>
> Q: Okay. Because you're not the kind of person that's gonna throw out something to somebody that they're doing something unlawful unless you're dead sure; correct?
>
> A: Exactly. As sure as it can be, yes.

(*id.* 237-38). Further, in his deposition, the plaintiff testified that at no time prior to his deposition of July 16, 2015, had he made any type of internal complaint about unlawful acts, unfair treatment, harassment, discrimination, or the like with any employer (including Wilson) (*id.* 84).

---

[3]On December 21, 2015, the undersigned denied the plaintiff's motion to amend his complaint to allege a claim of religious discrimination based on the untimeliness of his motion and the plaintiff's failure to assert such a claim in his EEOC charge (doc. 51).

After his termination on August 15, 2013, the plaintiff placed calls to Lackey and Taylor. He did not assert that his termination was based on race or retaliation in either phone call (*id.* 155-59). When the plaintiff filled out his EEOC questionnaire, he was asked, "Did you specifically allege to the company that your treatment was discrimination based on race and retaliation?" (*id.* 257). The questionnaire also asked him whether he was "involved in any previous anti-discrimination claim at work before the alleged retaliatory act?" The plaintiff answered "no" to both these questions. In his deposition, he reiterated that answer to be true as a matter of fact (*id.*).

The plaintiff alleges in his complaint that he was assigned a route in the Newberry area that was later taken away from him and given to a less senior Caucasian driver, Keith McLeod (doc. 1, comp.¶¶ 2-3). However, in his deposition, he testified that with the exception of his termination on August 15, 2013, he suffered no other adverse or negative, tangible job action as an employee of Wilson, nor was he denied any right, entitlement, or benefit due him by Wilson according to policy and law (doc. 39-2, pl. dep. 47-48). The plaintiff testified that he did the Newberry route for about four and a half weeks on a steady basis in late 2012 (*id.* 169-70). An African-American driver had been running the Newberry route before the plaintiff (*id.* 176). The plaintiff testified in his deposition that the person assigning the routes was Tim Starkes, the Dispatch Supervisor, who is African-American (*id.* 124, 176; doc. 39-6, Doonan decl. ¶ 4). The plaintiff stated that these assignments were not made or based on race (doc. 39-2, pl. dep. 125). Moreover, most of the drivers ran "wild", meaning that they had no assigned routes but were put on runs by Starkes according to daily operational needs, start times, Department of Transportation hours of service, etc. (doc. 39-6, Doonan decl. ¶4). The plaintiff testified that the only drivers who did have assigned routes and did not run "wild" were Lorris Garner, Al Crum, Jeff Roberts, and Abdul Davis, who are all African-American (doc. 39-2, pl. dep. 176-78).

In his complaint, the plaintiff claims that he was assigned defective equipment, although it is unclear as to whether this is a basis for any claim of race discrimination or retaliation (doc. 1, comp.¶ 4). Defendant Tim Starkes was the person who assigned

equipment and decided whether to send the drivers out with their equipment (doc. 39-2, pl. dep. 124-25, 182).   The plaintiff also testified that other drivers, aside from him, had problems with Wilson's equipment (*id.* 180-81).  He does not know anyone who never had a problem with the equipment (*id.*).  The plaintiff testified:

> Q:   Okay. These things with the trucks, though, you say everybody had some problems now and again. This wasn't a racial thing. You're not even claiming that.
>
> A:  I never did say that was racial.

(*Id.* 183).

The plaintiff also states in his complaint that he was given harder loads to deliver, specifically a load of copy paper to a school district, a paint delivery to Sherwin-Williams, a delivery of lawnmowers with a lift gate, and a delivery to US Foods at a cold storage warehouse (doc. 1, comp. ¶¶ 7, 9-10, 13; doc. 39-2, pl. dep. 188-89).  Again, Starkes assigned these loads (doc. 39-2, pl. dep. 189-90; doc. 39-6, Doonan decl. ¶ 4). Caucasian employees also got hard loads from Starkes (doc. 39-6, Doonan dec. ¶ 4).  The plaintiff had no evidence otherwise (doc. 39-2, pl. dep. 193).  He testified:

> Q: Okay. So you've got those White tractor trailer drivers getting hard loads, you're getting hard loads, they're coming from Tim. It ain't because of race.  Obviously. You understand? You see what I'm saying?
>
> A: I see what you're saying, yes.
>
> . . . .
>
> Q: You have nothing to compare those loads to any black or white driver; correct?
>
> A: I have-not documents, no.
>
> Q: You don't have any evidence. Do you?
>
> A: None that I have visible with me.

(*Id.* 191-92, 195-96).

The plaintiff also alleges in his complaint that at times his trailer was not properly loaded or sequenced according to his delivery schedule (doc. 1, comp. ¶¶ 16-17). The plaintiff testified, however, that Dale Cannon was responsible for the dock and getting the trailers loaded (doc. 39-2, pl. dep. 198). Cannon is also an African-American (*id.* 124-25). The employees loading the trailers were Cannon, two African-American dock workers, and two Caucasian dock workers (*id.* 198-99). The plaintiff unequivocally testified that he never had any racial problems with any of these four dockworkers who loaded his truck in 2012 and 2013 (*id.* 198-200). With respect to the dockworkers, the plaintiff testified as follows:

> Q: Okay. Well, the bottom line is, these dock workers who were loading your freight under the jurisdiction of Dale Cannon, between 3 a.m. in the morning and 7 a.m. in the morning, if they don't load it in proper sequence they're not doing that because you're an African-American person, are they?
>
> A: No, I wouldn't say that. No, huh-uh.
>
> Q: In other words, you agree with me, right?
>
> A: I agree with you, yes.
>
> Q: And, indeed, this mis-ordering of freight per the delivery plan on the trailer, to your knowledge, that happened to all drivers, white and black, at some given time; correct?
>
> A: Yeah, at some time it probably does happen, yes."

(*Id.* 201).

In his complaint, the plaintiff refers to injuries he received on the job (doc. 1, comp. ¶ 11 ). The plaintiff claims that he had a finger and hand injury while working for Wilson in 2012 (doc. 39-2, pl. dep. 69-70). He had a back injury with Wilson in April 2013 (*id.*). However, while he alleges those injuries occurred while he was employed by Wilson, he did not file a workers' compensation claim until February 27, 2014, six months after the termination of his employment (*id.*. 69-70, 82). At the time of his alleged back injury in April 2013, the plaintiff refused medical treatment and affirmatively declined to file a claim by his

14

own admission and writing (*id.* 204-205).  The handling and acceptance or denial of the plaintiff's post-termination workers' compensation claims were handled by the third party administrator for workers' compensation insurance, Liberty Mutual (*id.* 116-18, 212).  Those claims were resolved between June and September 2014 (*id.* 82).  The plaintiff gave a full release to Liberty Mutual and Wilson; all of his doctors' bills were paid, and he was fully compensated (*id.* 212-13).  In the EEOC intake questionnaire in 2014, the plaintiff was asked whether he was discriminated against or subjected to discrimination by being denied benefits, and he answered, "No" (*id.* 201-203).

In his complaint, the plaintiff alleges that Wilson "had a responsibility to hire and supervise its employees to prevent the prohibited and inhuman behaviors" (doc. 1, comp. ¶ 24).  In his deposition, however, the plaintiff testified that with regard to Doonan and Starkes (the only individuals against whom he asserts claims in this case), that he does not know anything about them personally, and he knows nothing about their lives outside of work, their employment histories, their management histories, their training, job performance, job evaluations, backgrounds, etc. (doc. 39-2, pl. dep. 251-52).  He acknowledges that Wilson distributes to its managers anti-discrimination, anti-retaliation, and anti-harassment policies, whereby violations of those policies are automatic termination offenses (*id.*).  He does not dispute that Wilson provided personal training to its managers, including Doonan and Starkes, regarding equal employment opportunity matters, anti-discrimination matters, and anti-retaliation matters (*id.*; doc. 39-5, Lackey aff. ¶ 11 ). The plaintiff testified as follows:

> Q: Okay. So far as you know, nobody above Keith Doonan and Tim Starkes were in any way negligent in how they trained them or supervised them. You don't know that, do you?
>
> A: I don't know that.
>
> Q: Don't have any proof or evidence to the contrary.
>
> A: No proof or evidence, no.

(Doc. 39-2, pl. dep. 252).

15

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Broadly construing the plaintiff's complaint, he alleges that because of discrimination based upon his race and/or in retaliation for his complaints to Taylor, Doonan, and Starkes (1)  he was removed from his route (the Newberry route) in early 2013, and it was given to a less senior Caucasian driver; (2)  he was assigned defective

16

equipment; (3) he was given difficult assignments with regard to the loads he delivered; (4) a less senior Caucasian driver was paid a higher hourly rate of pay than him; (5) his truck was not loaded in proper order pursuant to delivery sheets; (6) Wilson denied his workers' compensation claim; (7) he received a written warning; and, (8) he was terminated from employment (*see generally* doc. 1).

### Race Discrimination

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000). A plaintiff can establish discrimination under Title VII "through direct and indirect evidence," also known as the "mixed-motive" framework, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), also known as the "pretext" framework. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir.2015). Under the "mixed-motive" framework, a plaintiff succeeds if he "demonstrates that [a protected characteristic] . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 317 (4th Cir.2005) (internal quotation marks omitted). This evidence must both display a "discriminatory attitude" and bear a causal relationship with the adverse employment action. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir.2006). The plaintiff has made no such showing here. Accordingly, the undersigned will consider the plaintiff's disparate treatment claim under the pretext framework.

To establish a *prima facie* case of discrimination, a plaintiff must prove that: (1) he was in a protected class; (2) he was performing his job in a satisfactory manner; (3) the employer took an adverse action against him; and (4) the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc*., 354 F.3d 277, 285 (4th Cir.2004) (en banc). An inference of discrimination could be based on a comparison to the treatment of similarly situated co-workers of different races, religions, or national origins, if those colleagues were

17

treated more favorably under similar circumstances. *See Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008).

If the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981) (this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was a pretext for discrimination. *See Reeves*, 530 U.S. at 147.[4]

The plaintiff cannot satisfy a *prima facie* case with regard to his discharge or any other employment action by Wilson. Specifically, even assuming that the plaintiff could establish the first three elements, he has presented no evidence raising a reasonable inference of unlawful discrimination. With regard to his discharge, the plaintiff has failed to present any evidence that any driver of a different race engaged in similar conduct (failing to call in, being disrespectful to the terminal manager, and returning to the terminal without approval prior to completing deliveries) and was not terminated, and he has presented no other evidence that race was a factor in his termination from employment. Further weighing against any inference of race discrimination is the plaintiff's acknowledgment that 80% of the drivers at the Wilson Lexington terminal were African-Americans, and no other employees have suffered from the same allegedly discriminatory treatment as he has. Further, he acknowledges that if an employee of Wilson was insubordinate, disrespectful, abandoned a run, or caused a service failure--those were automatic termination offenses (doc. 39-2, pl. dep 163). Similarly, with regard to compensation, route and load assignments, equipment assignments, loading of his trailer

---

[4]The burden-shifting framework has been held to apply in discrimination cases arising under Section 1981, as well, *Patterson v. McLean Credit Union*, 491 U.S. 164, (1989); *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001), and in retaliation cases under both statutes, *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997) (addressing Title VII retaliation claim); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 n. 1 (4th Cir. 2000) (addressing § 1981 retaliation claim).

by co-workers, and denial of his workers' compensation claim, the plaintiff has presented absolutely no evidence that any actions of the defendants were motivated by race.

Further, to the extent the plaintiff has attempted to allege a cause of action for discriminatory discipline, he has also failed to establish a *prima facie* case. To establish a *prima facie* case of discriminatory discipline, the plaintiff must show: (1) he is part of a protected class; (2) his prohibited conduct was comparably serious to misconduct by employees outside the protected class; and (3) the disciplinary measures taken against him were more harsh than those enforced against other employees. *Prince-Garrison v. Md. Dept. of Health and Mental Hygiene*, 317 F. App'x 351, 353 (4th Cir. 2009) (citing *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993)). "An allegation of discriminatory discipline[,] however, does not necessarily require proof of an adverse employment action." *Id.* Again, the plaintiff has failed to come forward with any evidence that he was treated differently based upon his race.

Even if the plaintiff could establish a *prima facie* case of discrimination, he has failed to show that the legitimate, nondiscriminatory reasons articulated by the defendants for their actions were a pretext for discrimination. Specifically, as to his pay claim, the defendants presented undisputed evidence that the plaintiff's one comparator, Oxendine, had extra money in the paycheck that the plaintiff saw due to a reimbursement for a spousal insurance premium (doc. 39-5, Lackey aff. ¶ 10). The plaintiff does not have any evidence that Oxendine was being paid an hourly rate in excess of his own (doc. 39-2, pl. dep. 128-129, 223-224).

With regard to his equipment, load, and route assignments, the plaintiff admitted that defendant Starkes, who is African-American, was the person who made such assignments (doc. 39-2, pl. dep. 124-25, 176, 182, 189-90; doc. 39-6, Doonan decl. ¶ 4). "Plaintiff has offered no cogent argument for why [Starkes], a fellow African-American, would have discriminated against him because he is black.*" Rouse v. Intl. Paper Co.*, C.A. No. 2:12-1052 DCN, 2014 WL 131150, at *5 (D.S.C. Jan. 14, 2014) (citing *United States v. Crosby*, 59 F.3d 1133, 1135 n. 4 (11th Cir.1995) ("While we acknowledge that a ...

19

violation may occur even where a supervisor or decision-maker is of the same race as the alleged victim ....we note that the district court found that there was no evidence that [the decision-maker] held members of his own race to a higher standard of conduct than members of another race."); *Dungee v. Northeast Foods, Inc*., 940 F.Supp. 682, 688 n. 3 (D.N.J.1996) (that decision-maker is member of plaintiff's own protected class "weakens any possible inference of discrimination"); *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) ("[I]t is difficult for a plaintiff to establish discrimination when the allegedly discriminatory decision-makers are within the same protected class as the plaintiff.")). Further, the plaintiff also testified that other drivers also had problems with Wilson's equipment (*id.* 180-81), and Caucasian employees also got hard loads from Starkes (doc. 39-6, Doonan dec. ¶ 4). The plaintiff had no evidence that the loads he was assigned were any harder than those of the other drivers (doc. 39-2, pl. dep. 193-96).

As to his allegation that at times his trailer was not properly loaded or sequenced according to his delivery schedule, the plaintiff testified that Dale Cannon, who is also African-American, was responsible for the dock and getting the trailers loaded (*id.* 198). He further testified that all drivers at some time had improperly sequenced loads and that any improper loading was not because of the plaintiff's race (*id.*. 201).

With regard to the denial of his workers' compensation claim, the plaintiff has not disputed the defendants' evidence that Liberty Mutual handled the plaintiff's post-termination workers' compensation claims, the claims were resolved, the plaintiff gave a full release to Liberty Mutual and Wilson, all of his doctors' bills were paid, and he was fully compensated (*id.* 82, 116-28, 201-203, 212-13). Moreover, as to any negligent hiring and supervision claim (doc. 1, comp. ¶ 24) alleged by the plaintiff, he admitted in his deposition that he has no evidence that any employee of Wilson negligently trained or supervised Doonan and/or Starkes (doc. 39-2, pl. dep. 252).

Based upon the foregoing, summary judgment should be granted on the plaintiff's race discrimination claims.

***Retaliation***

A *prima facie* case of retaliation in violation of Title VII or Section 1981 requires proof (1) that the plaintiff engaged in protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal relationship existed between the protected activity and the adverse employment action. *Foster v. Univ. of Maryland- E. Shore*, 787 F.3d 243, 250 (4ᵗʰ Cir. 2015). The burden then shifts to the defendant to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. *Hill*, 354 F.3d at 285. If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons "were not its true reasons, but were a pretext for discrimination." *Id*. (quoting *Reeves*, 530 U.S. at 143).

"[T]o show 'protected activity,' the plaintiff in a Title VI retaliation case need 'only ... prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring.'" *Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003) (quoting *Bigge v. Albertsons*, *Inc*., 894 F.2d 1497, 1503 (11th Cir.1990)). Assuming for purposes of this motion that the plaintiff's conversations with Taylor, Doonan, and Starkes occurred exactly as the plaintiff describes in his response to the motion for summary judgment, he still offers no evidence that he made any complaint to these or any other Wilson managers regarding race discrimination or racially disparate treatment. In his deposition, he testified that, in those conversations, he did not make any complaint of discrimination or racism (doc. 39-2, pl. dep. 237-38) and that at no time prior to his deposition had he ever made any type of internal complaint about unlawful acts, harassment, discrimination, or the like (*id*. 84). Further, the plaintiff did not file his EEOC charge until after his discharge from Wilson. Consequently, the plaintiff cannot show that he engaged in any protected activity.

Furthermore, even if the plaintiff's conversations with Taylor, Doonan, and Starkes were considered protected activity, the plaintiff has presented no evidence establishing a causal connection between such activity and his subsequent discharge.

21

Moreover, as discussed above, the defendants have presented legitimate, non-retaliatory reasons for the plaintiff's termination from employment, as well as every other employment action complained of by the plaintiff, and the plaintiff has failed to show any evidence of pretext.  Accordingly, the plaintiff's retaliation cause of action also fails.

### Individual Defendants

The Fourth Circuit has clearly held that individual defendants do not qualify as "employers" for purposes of a Title VII lawsuit. *Lissau v. Southern Food Service, Inc*., 159 F.3d 177, 180-81 (4th Cir.1998); *Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999). Therefore, any purported Title VII claim against individual defendants Starkes and Doonan is without merit.  Further, supervisors can only be held liable under Section 1981 "if they intentionally cause an employer to discriminate based on race."  *Benjamin v. Sparks*, 4:14-CV-186-D, 2016 WL 1244995, at *5 (E.D.N.C. Mar. 23, 2016) (citing *Alexander v. City of Greensboro*, 762 F. Supp.2d 764, 790-92 (M.D.N.C. 2011); *Carson v. Giant Food, Inc*., 187 F. Supp.2d 462, 483 (D. Md. 2002) ("Directors or managers can be held personally liable when they intentionally cause a Corporation to infringe the rights secured by section 1981," but cannot be held liable when there is no evidence that they "directed, participated in or even approved of intentional discrimination" (quotations omitted)).  As discussed above, the plaintiff has failed to establish that any of the defendants engaged in any intentional discriminatory act towards him on the basis of his race.

### CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the defendants' motion for summary judgment (doc. 39) should be granted.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 26, 2016
Greenville, South Carolina

22

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).